

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EDP:BET                                    *271 Cadman Plaza East*
F. #2024R00934                             *Brooklyn, New York 11201*

July 8, 2025

<u>By E-mail and ECF</u>

The Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Svetlana Dali
     <u>Criminal Docket No. 25-14 (AMD)</u>

Dear Judge Donnelly:

   The government respectfully submits this letter in advance of the sentencing hearing scheduled for July 10, 2025 in the above-captioned case, in which the defendant Svetlana Dali was convicted after a jury trial of one count of being a stowaway on an aircraft, in violation of 18 U.S.C. § 2199. For the following reasons, the government agrees with both the Probation Department and the defendant that a sentence of time served would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a). The government defers to the recommendation of the Probation Department as to whether a term of supervised release should be imposed.

I. <u>Background</u>

   A. <u>Offense Conduct</u>

   On November 26, 2024, the defendant snuck onto Delta Air Lines flight DL264 ("Flight 264") at John F. Kennedy Airport ("JFK") in Queens, New York, without a boarding pass and flew as a stowaway to Charles de Gaulle Airport in Paris, France. Presentence Investigation Report ("PSR") ¶ 6. As reflected in surveillance footage from JFK, the defendant deliberately bypassed multiple boarding pass and identification checkpoints at the airport before sneaking onto Flight 264 without a ticket. PSR ¶¶ 7-9. Once the defendant boarded Flight 264, she went straight into one of the plane's bathrooms and hid there with her bags for several hours to avoid detection. When a flight attendant noticed, the defendant faked vomiting in an attempt to excuse her lengthy time in the bathroom. The defendant continued to feign illness until just before the plane landed, when flight attendants realized the defendant was still in the bathroom and instructed her to take her seat. After a flight attendant asked for the defendant's name and

boarding pass, the defendant gave her two fake names and failed to produce any boarding pass or ID. Alarmed, the flight attendant realized the defendant was not authorized to be on board and instructed the defendant to sit in a seat reserved for flight crew as the flight was minutes away from landing. Once the plane landed, the flight attendant positioned herself between the defendant and other passengers for their safety and instructed another flight attendant to check the bathroom for anything suspicious. PSR ¶ 10-11.

The defendant was arrested by French law enforcement when the flight landed in Paris on November 27, 2024. The defendant remained detained in France until December 4, 2024, when she was escorted by law enforcement onto a Delta Air Lines flight from Charles de Gaulle Airport to JFK. Previously, law enforcement had attempted to fly the defendant back to the United States on two occasions (November 30, 2024 and December 3, 2024, respectively) but the defendant was unable to be transported due to her disruptive behavior. PSR ¶¶ 12-13.

Upon the defendant's return to JFK on December 4, 2024, law enforcement interviewed her for approximately two hours. During that interview, the defendant admitted to flying as a stowaway on Flight 264. Among other things, she stated that she did not have a plane ticket, that she intentionally evaded airport security officials and Delta Air Lines employees so that she could travel without buying one, and that she knew she was "breaking the law." PSR ¶ 14.

B.    Prior Travel as a Stowaway

On February 10, 2024, U.S. Customs and Border Protection ("CBP") agents discovered the defendant hiding in a bathroom within a Federal Inspection Services ("FIS") area[1] in the Miami International Airport ("MIA") in Miami, Florida. The FIS area where the defendant was found is part of a secure international arrivals zone, located just before international travelers must proceed through passport control to enter the United States. The defendant claimed she was waiting for her husband in this area and said she had just arrived on an Air France flight, even though CBP could not find any records of the defendant on an Air France flight that day, and there were no records of the defendant entering or leaving the United States since 2015. Moreover, the defendant did not have her permanent resident card with her. After checking the entry points to the FIS area, fingerprinting the defendant, and searching her baggage, CBP agents escorted the defendant through customs and out of the airport. PSR ¶ 16.

On November 24, 2024—two days before the JFK stowaway incident—the defendant also snuck into a secure area of the departures terminal at Bradley International Airport ("BDL") in Hartford, Connecticut. At BDL, the defendant was able to sneak into the departures terminal by closely following an airport official through an identification and boarding pass checkpoint (mirroring her conduct at JFK). Once inside the terminal, the defendant hid inside a bathroom for a lengthy period to avoid detection. She also appeared to try to access a Jet Blue flight by getting in the boarding line but was turned away by gate agents. PSR ¶¶ 18-19.

---

[1]    FIS areas are secure zones within international airports where CBP and other law enforcement agents conduct inspections of arriving international passengers and cargo.

C.      The Defendant's Flight from Prosecution

On December 5, 2024, the defendant was charged by complaint and presented to the duty magistrate in this District.  On December 6, 2024, the defendant was released on conditions including GPS monitoring and a curfew.  On December 15, 2024—less than 10 days after her release—the defendant cut off her ankle monitor and absconded from her approved residence in Philadelphia, Pennsylvania.  Within 36 hours, the defendant was apprehended by Canadian law enforcement as she attempted to enter Canada near Buffalo, New York.  On December 17, 2024, the defendant was presented at a removal proceeding in the Western District of New York ("WDNY"), where the court ordered her to be transported back to EDNY in the custody of the U.S. Marshals Service.  On January 15, 2025, upon her arrival back in this District, the defendant was ordered detained pending trial.  PSR ¶¶ 2-5.

D.      The Defendant's Trial Testimony

On May 21, 2025, the defendant testified in her defense at her trial.  During her trial testimony, the defendant perjured herself as to at least three material facts, all of which were significant to whether the defendant knowingly boarded Flight 264 without the consent of Delta Air Lines (essentially the only fact at issue at trial).  PSR ¶ 20.

First, the defendant falsely testified that she spent almost the entirety of Flight 264 in the bathroom not because she was hiding or did not have a seat, but because she was vomiting and throwing up blood.  This sworn statement is contradicted by several pieces of evidence, including the defendant's own prior statements at her post-arrest interview, during which a federal agent asked her what she did in the bathroom "from the time of takeoff until landing," and the defendant said, "I was just shivering with fear."  The defendant later told the agents during her interview that she was fearful because she knew she was breaking the law by going through airport security without a boarding pass.  Moreover, during the testimony of a Delta Air Lines flight attendant, the flight attendant stated, among other things, that the defendant was offered medical assistance while in the bathroom but the defendant did not accept it.  The flight attendant also testified that once the defendant finally left the bathroom at the end of the flight, the flight attendant observed the defendant's demeanor abruptly change from "seeming sick" to looking "defiant" when airline employees realized she did not have a boarding pass.  PSR ¶ 21.

Second, the defendant falsely testified that it was "incorrect" that several people asked for her boarding pass at JFK before she boarded Flight 264.  This sworn statement is also contradicted by several pieces of evidence, including (i) surveillance footage showing an airport employee initially turning the defendant away from the security line after asking for her boarding pass, (ii) the defendant's own statements during her post-arrest interview, at which she told federal agents that at least two people asked for her boarding pass before she went through security, and (iii) the defendant's subsequent statements on cross examination at her trial, during which she eventually admitted that several people did in fact ask for her boarding pass while at the airport (after being confronted with the airport surveillance footage and her statements during her post-arrest interview).  PSR ¶ 22.

Third, the defendant falsely testified that she did not see Delta Air Lines employees checking for tickets at the gate before she boarded Flight 264.  This is contradicted by her prior statements to federal agents at her post-arrest interview, during which the agents

showed her surveillance footage of herself sneaking onto Flight 264 at the gate. The agents asked the defendant whether she knew that airline employees were checking for tickets at the gate, and the defendant said "yes, they were checking everyone's tickets." The defendant then spent several minutes explaining that she was able to sneak past the gate agents during this passenger "registration" by taking advantage of a moment when a gate agent told all passengers who had not had their tickets checked to step back. Instead of stepping back, the defendant stepped forward to join passengers who had already had their tickets checked. PSR ¶ 23.

## II.    The Sentencing Guidelines

The government, the defendant, and the Probation Department all agree that the defendant's Criminal History Category is I, and that her Adjusted Offense Level is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3) | 4 |
| Plus:   Secure Area of Airport (U.S.S.G. § 2B2.3(b)(1)(A)(iv)) | +2 |
| Plus:   Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Minus: Zero Point Offender (U.S.S.G. § 4C1.1) | -2 |
| Total: | 6 |

PSR ¶¶ 27-35. Because the defendant is in Criminal History Category I, the applicable Guidelines range is 0 to 6 months' imprisonment. PSR ¶ 77.

## III.    The Defendant's Objections to the Presentence Investigation Report

On July 6, 2025, the defendant filed a letter containing eight objections to the PSR. See Def.'s Objections to the PSR ("Objection"), ECF No. 52. The government's responses to those objections are below.

With respect to the defendant's objection concerning the two-point obstruction of justice enhancement, see Objection ¶¶ 1-2, the government agrees with the Probation Department that the obstruction enhancement applies for two independent reasons: (i) the defendant cut off her ankle monitoring device and absconded during her pretrial release; and (ii) the defendant committed perjury on numerous occasions during her trial testimony. PSR ¶ 24. Although the defendant does not dispute that the obstruction of justice enhancement applies because she absconded during her pretrial release, she disputes that it also applies because she committed perjury, asserting that "[s]he did not lie during her [trial] testimony." Id. Apart from one conclusory statement that her testimony was not "materially false"—which is contradicted by a significant number of facts, as described above—

4

███████████████████████████████████████████████

l.  As detailed above, the defendant's trial testimony about what happened on Flight 264 was demonstratively false and self-serving in a number of ways, which the defendant fails to meaningfully challenge in her objections to the PSR or her sentencing letter.

With respect to the defendant's objection to paragraph 13 of the PSR—which states that authorities made two attempts to return the defendant from Paris to New York but that the defendant was removed from the flights due to her aggressive and disruptive behavior, see Objection ¶ 3—the government believes that this paragraph is generally accurate.  As noted in the PSR, the government understands that the first attempt to transport the defendant back to New York occurred on November 30, 2024.  The defendant's assertion that she did not engage in any disruptive conduct on that first attempt is belied by a video published on YouTube by the New York Post, as cited in footnote 2 of the PSR,[2] which shows the defendant yelling and resisting transport on that flight.  The second attempt to transport the defendant back to New York occurred on December 3, 2024.  The government understands from Delta Air Lines that this attempt was unsuccessful because the defendant had been placed in restraints by French law enforcement due to her disruptive behavior, and that the airline determined it could not properly board her in those restraints.  In light of this, the government would propose the following revision to paragraph 13 of the PSR:

> On November 30, 2024, and December 3, 2024, law enforcement attempted to fly the defendant back to the United States, but the defendant was ~~removed from both flights before takeoff~~ unable to be transported due to her aggressive and disruptive behavior.

The defendant was ultimately returned to New York under law enforcement escort during a third attempt on December 4, 2024.

With respect to the defendant's objection to paragraph 8 of the PSR—which states that the defendant entered airport security through a special lane designated for airport employees, see Objection ¶ 4—the government believes this paragraph is accurate.  Despite the defendant's self-professed belief that all passengers could use that lane to enter security, there is no dispute that only airport and airline employees were in fact allowed to use it.

The government takes no position with respect to the other objections described in the defendant's letter.  See Objection ¶¶ 5-9.

III.    Applicable Law

The Sentencing Guidelines are advisory, not mandatory.  United States v. Booker, 125 S. Ct. 738, 764-65 (2005).  However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence.  Id.  In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

---

[2]    See https://www.youtube.com/watch?v=1Vi8tv6LzRA.

> [A] district court should begin all sentencing proceedings by
> correctly calculating the applicable Guidelines range. As a matter
> of administration and to secure nationwide consistency, the
> Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).

Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted). Those statutory factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed [] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[,]" 18 U.S.C. § 3553(a)(2)(A).

## IV.    The Appropriate Sentence

The government joins the Probation Department and the defendant in respectfully requesting that the Court impose a sentence of time served. The defendant has been incarcerated for just under seven months, which is slightly above the Guidelines range of zero to six months. This length of time appropriately reflects the nature, circumstances, and seriousness of the defendant's conduct as well as the need to promote respect for the law and to adequately deter this defendant and others. Stowaway travel is a serious offense that endangers both the offender and other air passengers. Deterrence is particularly important in stowaway cases, as publicized incidents encourage copycat behavior that threatens the safety of air travel and undermines the integrity of airport security systems.[3] Here, the defendant not only stowed away from JFK to Paris on November 26, 2024, but she also appears to have stowed away to and from Europe on several other occasions prior to that—which both emphasizes the need for specific deterrence in her case and, as noted in the PSR, warrants an upward departure from the Guidelines range. See PSR ¶ 88. Moreover, throughout this investigation and prosecution, the defendant has engaged in a substantial amount of conduct that arguably warrants an upward variance, which has included engaging in disruptive behavior before she was charged (when authorities attempted to return her to the United States), absconding while on pretrial release, and lying while under oath at her trial.

---

[3]    Since the defendant's crime, there have been several other instances in which others have attempted to travel as stowaways on airplanes. See, e.g., "How a stowaway slipped through security and made it on a plane to Hawaii, according to documents," January 14, 2025, https://kvia.com/cnn-national/2025/01/14/how-a-stowaway-slipped-through-security-and-made-it-on-a-plane-to-hawaii-according-to-documents/; see also "Dead body found in wheel well after United flight lands in Hawaii," December 26, 2024, https://www.reuters.com/world/us/dead-body-found-wheel-well-after-united-flight-lands-hawaii-2024-12-26.

As noted above, the government defers to the Probation Department's recommendation that the Court impose a one-year term of supervised release.



## V.    Conclusion

For the foregoing reasons, the government respectfully submits that a sentence of time served would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

/s/ Brooke Theodora
Brooke Theodora
Assistant U.S. Attorney
(718) 254-6342

cc:    Clerk of the Court (AMD) (by e-mail and ECF)
       Michael Schneider, Esq. (by e-mail and ECF)